NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOSEPH MIRAKAY, LOUIS MESSINA, MICHAEL ELEFTERAKIS & JOHN GEMBINSKI, on behalf of themselves and others similarly situated, | : : : : : : | |
| Plaintiffs, | : : | Civil Action No. 13-cv-4429 (JAP) |
| v. | : : | **OPINION** |
| DAKOTA GROWERS PASTA COMPANY, INC., GLENCORE XSTRATA, and VITERRA, INC., | : : : | |
| Defendants. | : : : | |

PISANO, District Judge

Presently before the Court are three (3) motions: (1) a motion for final settlement approval of the settlement in this class action by Joseph Mirakay, Louis Messina, Michael Elefterakis, and John Gembinski, on behalf of themselves and others similarly situated (collectively "Plaintiffs") [docket #65]; (2) Plaintiffs' motion for attorneys' fees and reimbursement of litigation expenses [docket #66]; and (3) a motion for leave to file a sur-reply brief by Nanette Forte-Gerst, Chrissie Greatrex, Emily Greatrex, George Greatrex, William Polouze, and Keith Rothman (collectively "the Objectors") [docket #76]. The Objectors filed various objections to the settlement agreement [docket #45-47, #49-52, #58, #60-62, and #64], to which Plaintiffs and Defendant, Dakota Growers Pasta Company, Inc. ("Defendant") responded [docket #67 and #72]. The Court considered the papers filed by the parties and the arguments set forth at the fairness hearing on September 24, 2014. For the reasons that follow, this Court GRANTS Plaintiffs' motion for final settlement approval [docket #65], GRANTS Plaintiffs' motion for attorneys' fees and

reimbursement of litigation expenses [docket #66], and DENIES the Objectors motion for leave to file a sur-reply brief as it is now moot [docket #76].

## I.      BACKGROUND

On July 22, 2013, Plaintiffs filed the instant action bringing claims on behalf of a nationwide class under the New Jersey Consumer Fraud Act ("NJFCA"), N.J.S.A. §§ 56:8-1, *et seq*., and for breach of contract, breach of express and implied warranty, as well as claims under various state statutes ("the Complaint") [docket #1][1].  The Complaint alleges that Defendant deceptively markets, advertises, and sells Defendant's Dreamfields pasta product ("Dreamfields") as a healthy alternative to traditional pasta, that it has a lower glycemic index than traditional pasta, and that it contains only five (5) grams of digestible carbohydrates.  In October 2013, Plaintiffs served Defendant with requests for production of documents, interrogatories, requests for admission, notice of deposition, and two third-party deposition notices.  Throughout the discovery process, Plaintiffs developed an understanding of the strengths and weaknesses of their claims, as well as the viability of the defenses set forth by Defendant.  As such, while engaging in discovery, the parties agreed to mediate this dispute with the Honorable Garret E. Brown, Jr. (Ret.), and prior to the mediation, engaged in additional discovery surrounding issues of pricing, sales volume, sales distribution and marketing.

On December 10, 2013, the parties and Plaintiff Jesse Weiss from the Minnesota Action engaged in a lengthy and contentious in-person mediation.  See *Declaration of Hon. Garrett E. Brown (Ret.)*.  This mediation session resulted in the settlement agreement which forms the basis of the instant motions before this Court.  Under the terms of the settlement, the parties agreed that Defendant would pay $5,000,000, inclusive of notice and administration costs, for distribution to

---

[1] Similarly, on July 19, 2013, Jesse Weiss filed a Complaint making substantially the same allegations in the United States District Court of Minnesota (the "Minnesota Action").

class members who submit a valid claim form.  See *Settlement Agreement*, at ¶ 4(A).  Further, the settlement agreement provides that class members who purchased Dreamfields on-line will automatically receive $1.99 for each box purchased during the class period.  There is no limit on the number of boxes purchased on-line for which class members may be reimbursed; however, class members who purchased Dreamfields in a store may submit a claim for reimbursement of $1.99 per box for up to fifteen (15) boxes.

In addition to the monetary aspects of the settlement, Defendant also agreed to injunctive provisions which remove the advertising at issue.  *Id*. at ¶ 5.  Defendant agreed to remove, for a period of one (1) year from the date of the final judgment and order, all statements from Dreamfields packaging claiming the pasta has: (1) a lower glycemic index than traditional pastas; (2) the ability to reduce spikes in blood glucose levels; and (3) only five (5) grams of digestible carbohydrates.  In exchange for the cash settlement amount and injunctive relief, the parties agreed to provide each other with full, mutual releases.  *Id*. at ¶¶ 8-9. Defendant also agreed to separately pay attorneys' fees and expenses of $2,900,000 ("fee award"), such that this amount will not be deducted from the cash settlement awarded to class members.  *Id*. at ¶ 6.  Additionally, to the extent that the amount of claims submitted does not exhaust the total available settlement funds, then each class members' recovery will be adjusted upwards by as much as 50% and any residual funds will not revert to Defendant but rather, will be donated on a *cy pres* basis to the American Diabetes Association, which has agreed to communicate the terms of the settlement to its members.  *Id*. at ¶ 4(C).  Finally, Defendant agreed to pay the proposed class representatives, Jesse Weiss from the Minnesota action, Joseph Mirakay, Louis Messina, Michael Elefterakis and John Gembinski an aggregate incentive award of $20,000 collectively for their efforts in this litigation and the risks they assumed.

On April 15, 2014, Plaintiffs moved before this Court for preliminary settlement approval [docket #38].   On May 9, 2014, this Court entered a preliminary approval Order which conditionally certified the proposed settlement class, appointed the class representatives and class counsel, and set a fairness hearing to be held on September 24, 2014, at 10:00 a.m. to determine whether: (1) final settlement approval should be granted; (2) the class counsels application for attorneys' fees and expenses should be granted and in what amount; and (3) the request for an incentive award to the class representatives should be granted and in what amount [docket #43]. The preliminary approval Order also directed the parties and settlement administrator to begin the notice plan on or before July 1, 2014, and to complete it within sixty (60) days.  Further, the Order required any person objecting to the settlement to do so in writing by September 1, 2014, stating, among other things, the specific grounds for the objection.

On July 1, 2014, the claims administrator sent notice via email directly to 333,041 settlement class members who previously had signed up with Defendant to receive coupons and recipes for Dreamfields pasta, and 5,581 customers who purchased Dreamfields pasta on-line from Defendant.  See *Declaration of Shannon R. Wheatman, Ph.D.*, at ¶ 14, Ex. C.  The administrator sent a reminder notice to these email addresses on August 19, 2014.  *Id*. at ¶ 15.  The administrator also caused notice to be published in periodicals selected specifically by demographic profiles that most closely matched those of Dreamfields pasta purchasers, including *Better Homes & Gardens*, *Cooking Light*, *People*, *Health,* and *American Profile*. *Id*. at ¶¶ 16-22.  Approximately 325 million internet impressions, including banner advertisements on the following online networks for a four (4)-week period: Advertising.com Network, AOL Media Network, Facebook.com, Specific Media Network, and Xaxis were also delivered by the administrator.  *Id*. at ¶ 23.  Targeted banner advertisements delivered an additional 25 million impressions.  *Id*. at ¶¶ 23-24.  The administrator

then conducted a robust claims stimulation campaign that included: (1) a national press release to over 5,000 news outlets; (2) social posts on Twitter; (3) targeted sponsored news feeds on Facebook and Twitter; (4) posting information on the Promoted Stories network; (5) Keysearch advertising; and (6) notice disseminated twice by the American Diabetes Association via a monthly newsletter to its more than 200,000 members.  *Id*. at ¶ 30.  Plaintiffs demonstrated calculations revealing that notice via these vehicles reached 80% of the potential class members approximately three (3) times.  *Id*. at ¶ 25.

As stated above, the Court received several objections prior to the fairness hearing, a majority of which appeared to be boilerplate in nature and nearly identical in content.  In any event, the objections primarily focused on the settlement being "unfair and unreasonable" because it did not "provide best notice to all persons who may have purchased Dreamfields pasta."  Specifically, the Objectors contend that the notice should have been posted on Defendant's website, product boxes, posted in supermarkets and drug stores, and communicated to groups such as heart associations and diabetic associations.  Ironically, however, the Objectors also contend that "the settlement is flawed because many people who did not purchase Dreamfields pasta can submit fraudulent claim forms."  The Objectors also believe the settlement to be inadequate because of the amount the *cy pres* recipient may receive, the injunctive provisions only last for (1) year, and the attorneys' fees are allegedly unreasonable.  Plaintiffs responded to these objections and the Court heard from both parties, the Objectors' attorney, and the Objectors themselves at the fairness hearing and reserved decision on the instant motions.

## II.    DISCUSSION

### a.  Legal Standard

5

Final approval of a class action settlement involves two (2) fundamental inquiries.  First, the Court must determine whether a class can be certified under Rule 23(a) and if at least one (1) prong of Rule 23(b) has been satisfied.  *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231, 2248, 138 L. Ed. 2d 689 (1997).  Second, the Court must determine whether the proposed settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004).   In determining whether to grant approval, the Third Circuit Court of Appeals has noted that there is an "overriding public interest in settling class action litigation, and it should therefore be encouraged."  *Warfarin Sodium*, 391 F.3d at 535.  However, "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously, [the Third Circuit] require[s] district courts to be even 'more scrupulous than usual' when examining the fairness of the proposed settlement. *Id*. at 534 (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995)).

### b.  Analysis

#### i.  *Class Certification*

Rule 23 has two primary components in determining whether a class can be certified.  First, the party seeking class certification must first establish that the four (4) requirements of Rule 23(a) have been met – namely: "(1) numerosity (a class [so large] that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical . . . of the class); and (4) adequate representation (representatives will fairly and adequately protect the interests of the class)." *Warfarin Sodium*, 391 F.3d at 527 (internal quotations omitted) (citing *Amchem*, 521 U.S. at 613)).  Second, the Court must find that the class fits within one (1) of the three (3) categories of class actions set forth

6

in Rule 23(b).  *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 302 (3d Cir. 2005).  In the present matter, Plaintiffs seek certification under Rule 23(b)(3), which is "the customary vehicle for damage actions."  *Id*.  As such, the "Court must determine that common questions of law or fact predominate and that the class action mechanism is the superior method for adjudicating the case." *Id*.  In making the class certification analysis, the Court may take the proposed settlement into consideration.  *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 308 (3d Cir. 1998) (citation omitted).  Indeed, "[w]hether trial would present intractable management problems . . . is not a consideration when settlement-only certification is requested, for the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.

### a.   Rule 23(a) Factors

Here, Plaintiffs have met the Rule 23(a) factors.  It is clear that Plaintiffs meet the numerosity requirement because during the class period, Dakota Growers sold millions of boxes of Dreamfields pasta annually in the United States.  *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 510 (D.N.J. 1997) *aff'd sub nom. In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283 (3d Cir. 1998) ("To meet the numerosity requirement, class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members.") (citation omitted).  Even assuming that individual class members bought multiple boxes, the number of class members still exceeds that which would be necessary to satisfy the numerosity requirement. See *Stewart v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001) ("No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met.") (citing *5 James Wm. Moore et al., Moore's Federal Practice* § 23.22[3][a] (Matthew Bender 3d ed.1999)).

Next, the settlement class members share many common issues of law and fact. Specifically, all class members were subjected to the same advertised claims relating to Dreamfield's nutritional quality and were damaged by having paid a price premium for a product that allegedly lacked its claimed benefits.  As such, questions of law and fact such as: whether Defendant misrepresented or omitted material facts in connection with the promotion, marketing, advertising, packaging, labeling and sale of Dreamfields pasta; whether Defendant represented that Dreamfields pasta has characteristics, benefits, uses, or qualities that it does not actually have; whether Defendant's acts and practices in connection with the product violated deceptive trade practice statutes; and whether Defendant's conduct injured members of the class, are common to all settlement class members.  As such, commonality is satisfied. See *Warfarin Sodium*, 391 F.3d at 527-28 ("Rule 23(a)(2)'s commonality element requires that the proposed class members share at least one question of fact or law in common with each other."); see also, *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) ("Because the [commonality] requirement may be satisfied by a single common issue, it is easily met. . . .").

Similarly, Plaintiffs have demonstrated that the typicality requirement has been satisfied. The class members all purchased Dreamfields pasta with the alleged misrepresentations on its label and were exposed to Defendant's uniform advertising, marketing and promotional campaign. Compl., at ¶ 11.  In considering typicality, the Court must determine whether "the named plaintiffs' individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 184 (3d Cir. 2001) (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985)).  Typicality does not require that all class members share identical claims, rather, so long as "the claims of the named plaintiffs and putative class

members involve the same conduct by the defendant, typicality is usually established regardless of factual differences." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 184 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (citation omitted). Here, because the claims of Plaintiffs and the settlement class members "all arise from the alleged misrepresentations by [Defendant]," the typicality requirement is met. *Johnston*, 265 F.3d at 185; see also, *Warfarin Sodium*, 391 F.3d at 532 ("[T]he claims of the representative plaintiffs arise from the same alleged wrongful conduct on the part of [the defendant], specifically the alleged misrepresentation and deception . . . . Accordingly, the District Court did not abuse its discretion in finding that Rule 23's typicality requirement was satisfied.").

Last, Plaintiffs have satisfied the adequacy component of Rule 23(a). This requirement involves a two (2) part inquiry intended to ensure that the absentees' interests are fully pursued: (1) the named plaintiffs' interests must be sufficiently aligned with the interests of the absentees, and (2) the plaintiffs' counsel must be qualified to represent the class. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 800 (3d Cir. 1995). As for the first step, the Court must determine whether "the representatives' interests conflict with those of the class." *Johnston*, 265 F.3d at 185. The Court is not aware of any conflict between the proposed class representatives and the class. Indeed, Plaintiffs are typical consumers who purchased Dreamfields pasta during the class period and share the same interests as other class members in seeking to stop the allegedly deceptive advertising of the product and to recover for deceived class members. As for the second step, the class is represented by Goldman Scarlato, Karon & Penny, P.C., Federman & Sherwood, Zaremba Brownell & Brown, PLLC and Branham Law, LLP, law firms with national reputations in class action complex litigation fields. See *Motion for Settlement*, at Ex. 6 [docket #38]. Further, with regard to negotiating the settlement, Judge Brown stated in

his declaration that "[a]ll parties were well prepared and represented by highly experienced counsel." *Declaration of Hon. Garrett E. Brown (Ret.)*, at ¶ 13.  Plaintiffs' counsel has given this Court no reason to doubt its professional qualifications and adequacy in representing this class. Accordingly, Plaintiffs have sufficiently established all four (4) elements of Rule 23(a).

### b.  Rule 23(b)(3)

As stated above, Plaintiffs seek certification under Rule 23(b)(3), which is "the customary vehicle for damage actions."  *In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 302 (3d Cir. 2005). Rule 23(b)(3) provides that:

> A class action may be maintained if Rule 23(a) is satisfied and if:
> . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23.  As such, the primary criteria that the Court must evaluate in light of these pertinent factors are predominance and superiority.  *Amchem* 521 U.S. at 615.  As the Supreme Court explained in *Amchem*, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud."  *Id.* at 625. Further, in a settlement-only class action, "the court certifying the class need not examine issues of manageability" and therefore, predominance is not a high standard.  *Cmty. Bank*, 418 F.3d at 306.  The Third Circuit also recently affirmed the

principles that inform the predominance analysis when considering certification of a settlement class:

> From our case law, we can distill at least three guideposts that direct the predominance inquiry: first, that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members; second, that variations in state law do not necessarily defeat predominance; and third, that concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class.

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 297 (3d Cir. 2011).

Here, Plaintiffs have alleged claims on behalf of a nationwide class for breach of warranty and unjust enrichment and various state subclasses under certain state consumer protection statutes.  Importantly, however, Plaintiffs are seeking certification of a settlement-only class; as such, the existence of any individual inquiry does not necessarily preclude class action treatment where all class members face the necessity of proving the same fraudulent scheme.  See *Cmty. Bank*, 418 F.3d at 307; see also *Prudential*, 148 F.3d at 315 (". . . [P]resence of individual questions does not *per se* rule out a finding of predominance. In particular, the 'presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate.'" (quoting *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985)).  The core overriding questions in this case relate to Defendant's labels, marketing, and advertising, which contain uniform and nationally disseminated messages, and whether those representations violated the law.  Thus, the predominance factor is satisfied.

Rule 23(b)(3) also requires a finding that "a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy."  As such, this inquiry requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication." *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d

141, 149 (3d Cir. 2008) (citation omitted).  The following factors are relevant to the superiority requirement:

> (1) the interest of individual members of the class in controlling the prosecution of the action, (2) the extent of litigation commenced elsewhere by class members, (3) the desirability of concentrating claims in a given forum, and (4) the management difficulties likely to be encountered in pursuing the class action.

*Id.*  Here, there is a large number of potential class members; however, individual members have little interest in controlling the prosecution of the action because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit.  See *Warfarin Sodium*, 391 F.3d at 534.  This is also evidenced by the fact that only one (1) other litigation was commenced elsewhere against Defendant.  Further, it is highly desirable to concentrate the claims in a given forum, because if this were not the case, thousands of individual trials would impose a massive burden on Court's resources.  Last, the manageability factor is irrelevant because "the proposal is that there be no trial."  *Amchem*, 521 U.S. at 620.  As such, Rule 23(b)(3) is also satisfied and the class may be certified here for purposes of settlement.

### ii.  Settlement Approval

In order to properly determine whether a settlement is fair, reasonable, and adequate, and thus subject to approval by the Court, the Third Circuit has identified nine (9) factors to be considered:

> (1) The complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975).

The first *Girsh* factor "captures the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001).  Here, this factor favors settlement because continuing litigation through trial would require additional discovery, extensive pretrial motions addressing factual and legal questions, and ultimately a complicated and lengthy trial.  The case would also require vast expert analysis of the nutritional qualities of Dreamfields as well as the consumer impact of Defendant's representations regarding the product's purported nutritional attributes, which would involve substantial expenses.  Given the prospect of this litigation, and engendering enormous time and monetary expenditure if it were to go forward, this factor weighs strongly in favor of settlement approval.

The second *Girsh* factor "attempts to gauge whether members of the class support the settlement." *Prudential*, 148 F.3d at 318.  Here, of the 61,340 claims received as of September 9, 2014, only seven (7) class members have requested exclusion from the class.  See *Declaration of April Hyduck Regarding Dissemination of the Notice and Receipt of Requests for Exclusion and Objections to Date and Claims Filed to Date* ("Hyduk Dec."), at ¶¶ 17, 20.  Having heard the objections made, the Court is unimpressed with the Objectors argument that there was somehow insufficient notice yet also the potential for fraudulent claims, as these arguments are entirely contradictory.  Further, under *Girsh*, such a small number of negative responses compared to the high number of claims filed favors approval of a class action settlement agreement. *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1314 n. 15 (3d Cir. 1993) (noting that silence is a "tacit consent" to settlement).  As of the date of Plaintiffs' motion, only twelve (12) objections to the settlement had been filed, *Id.* at ¶ 18, and the number of objectors from the class is a strong indication of the reaction of the class which favors settlement here. *Cendant*, 264 F.3d at 235 ("The vast disparity

between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement.").

The third *Girsh* factor "captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *Id.*; see also *GM Trucks*, 55 F.3d at 813.  This inquiry necessarily has two (2) inquiries – factual and legal – and the discovery considered by the Court may include "informal" discovery received from the defendant, third-parties and experts.  See, *e.g.*, *GM Trucks*, 55 F.3d at 813 (considering expert testimony and other evidence from parallel state court proceedings).  Here, while the case is in a relatively early stage of litigation, Plaintiffs have conducted extensive research and discovery into Defendant's advertising of Dreamfields as well as retained experts in the field.  Plaintiffs' counsel spent months diligently investigating the factual and legal basis for the claims asserted in the Complaint, and also reviewed Defendant's public filings, patent application, advertising and websites, as well as numerous blog posts, articles and scientific studies regarding Dreamfields pasta and human glycemic responses to ingestion of certain foods. Plaintiffs' counsel also interviewed several bloggers, authors, and scientists regarding the claims alleged in the complaint and spoke to several experts regarding economic, scientific and consumer behavior issues relevant to the case. Plaintiffs' counsel also spent significant time obtaining, reviewing and analyzing documents and consulting with experts, as well as conducting confirmatory discovery, including interviewing key personnel at Dreamfields responsible for the creation of the product, quality control and testing. Moreover, class counsel have extensive experience in litigating cases of this type which favors their understanding of the legal merits and pitfalls in connection therewith.  As such, the Court is

confident that counsel had an adequate appreciation of the merits of the case before negotiating settlement.

The fourth *Girsh* factor asks the Court to evaluate the risks of establishing liability by "examin[ing] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *GM Trucks*, 55 F.3d at 319. While Plaintiffs have alleged numerous facts against Defendant, they also recognize the uncertainties of litigation and as stated above, the fact that this case would likely end up being a battle of experts which contains inherent risks in establishing liability. Also, despite the Court finding that class certification is proper for purposes of this settlement, Plaintiffs would incur risks in class certification should the litigation continue. In settling the claims, Plaintiffs had to account for these risks and in light of them, the settlement provides substantial monetary and injunctive benefits, and does so imminently without the delay of protracted litigation. Further, by settling the claims, thousands of potential class members are being notified now of the alleged deception by Dreamfields as opposed to years down the line subsequent to a lengthy litigation. As such, the settlement value achieved in the face of the risks surrounding continued litigation weighs heavily in favor of settlement.

The fifth *Girsh* factor "attempts to measure the expected value of litigating the action rather than settling it at the current time." *Cendant*, 264 F.3d at 238. The Court looks at the potential damage award if the case were taken to trial against the benefits of immediate settlement. *Prudential*, 148 F.3d at 319. As mentioned previously, continued litigation here will present risks on both liability and class certification. Further, the liability issues would likely turn on the fact finders' assessment of each parties' expert witnesses, and the settlement class members might also have difficulty at trial establishing that they were damaged and to what extent. As such, the cash

value and injunctive relief achieved in the settlement weighs in favor of final approval.  See *Cendant*, 264 F.3d at 239 (where the Third Circuit analyzed that there was no compelling reason to think that "a jury confronted with competing expert opinions" would accept the plaintiff's damages theory rather than that of defendant, and thus the risk in establishing damages weighed in favor of approval of the settlement).

In considering the sixth *Girsh* factor, because the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action, *GM Trucks*, 55 F.3d at 817, the Court must measure the likelihood of obtaining and maintaining a certified class if the action were to proceed to trial. *Girsh*, 521 F.2d at 157.  Issues such as manageability that are not a concern in a settlement-only class such as here, would likely pose formidable challenges to certification of a *litigation* class.  *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 309 (3d Cir. 2008).  Similarly, differences in state law that often complicate the certification of a nationwide class, see *e.g.*, *In re LifeUSA Holding Inc.*, 242 F.3d 136, 147 n.11 (3d Cir. 2001), are "irrelevant to certification of a settlement class," but would likely pose an issue if the case were to proceed to trial.  *Warfarin Sodium*, 391 F.3d at 529.  Given the value of the product at issue, if a class could not be certified here for settlement purposes, it would likely leave few, if any, class members with both the resources and financial incentive to pursue claims on their own behalf, with the practical result of no recovery by anyone. See *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." (emphasis in original)). The proposed settlement provides a remedy now to all class members, rather than risking an uncertain result after years of expensive litigation.  Accordingly, this factor strongly supports final approval.  See *Warfarin Sodium*, 391 F.3d at 537 (". . . [While C]oncerns about the manageability

of a multistate class of consumers … did not pose a problem for the certification of a settlement class, there is a significant risk that such a class would create intractable management problems if it were to become a litigation class, and therefore be decertified. . . . [This] significant risk that the class would be decertified if litigation proceeded weighs in favor of settlement.").

The seventh *Girsh* factor considers "whether the defendant[ ] could withstand a judgment for an amount significantly greater than the Settlement." *Cendant*, 264 F.3d at 240. Importantly, however, the inquiry is not whether the Defendant's resources exceed the settlement amount, but whether class members are likely entitled to a greater amount under the theories of liability that existed at the time the settlement was reached. *Warfarin Sodium*, 391 F.3d at 538 (". . . [T]he fact that [defendant] could afford to pay more does not mean that it is obligated to pay any more than what the consumer and … class members are entitled to under the theories of liability that existed at the time the settlement was reached. Here, the District Court concluded that [defendant's] ability to pay a higher amount was irrelevant to determining the fairness of the settlement. We see no error here."). Here, settlement class members can receive virtually 100% of their damages per purchase, for up to fifteen (15) purchases, as well as injunctive relief to consumers in the form of a label change. Additionally, the settlement amount benefits the proposed class without accounting for any of the class counsels' fees or costs. In considering the fact that many putative class members who submitted claim forms for up to fifteen (15) boxes would likely have difficulty proving more than that number of purchases, the relief and efficiencies achieved through settlement weight in favor of final approval.

The last two (2) *Girsh* factors are usually considered together. They ask "whether the settlement is reasonable in light of the best possible recovery and the risks the parties would face if the case went to trial." *Prudential*, 148 F.3d at 322; see also *Warfarin Sodium*, 391 F.3d at 538

(court should consider "whether the settlement represents a good value for a weak case or a poor value for a strong case.").  The Court must also "guard against demanding too large a settlement based on its view of the merits of the litigation; after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."  *GM Trucks*, 55 F.3d at 806.  Here, the likelihood that a greater result could be achieved at trial is remote as the settlement affords injunctive relief by correcting the labeling as well as substantial monetary relief.  Given the inherent risks discussed above in litigating a damages class in this case and the risk of certifying a litigation class, the settlement benefits are highly significant.  As such, the final two (2) *Girsh* factors weigh in favor of settlement approval.

In addition to the *Girsh* factors, Rules 23(c)(2)(B) and 23(e) requires the Court to ensure that all class members who would be bound by a class settlement are provided the best notice practicable in order to protect the rights of absent members of the class.  See *In re Insurance Brokerage Antitrust Litig.*, MDL No. 1663, 2012 WL 1071240, at *13 (D.N.J. Mar. 30, 2012) ("[P]roper notice must meet the requirements of [Rules] 23(c)(2)(B) and 23(e).").  Sufficient notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950). Rule 23(c)(2)(B) requires that notice "inform class members of (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the class member's right to retain an attorney; (5) the class member's right to exclusion; (6) the time and manner for requesting exclusion; and (7) the binding effect of a class judgment on class members under Rule 23(c)(3)."  Fed. R. Civ. P. 23(c)(2)(B)(i)-(vii).  Rule 23(e) notice must contain a summary of the litigation sufficient to "apprise interested parties of the pendency of the settlement proposed and

to afford them an opportunity to present their objections." *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 231 (D.N.J. 1997) (citing *Mullane*, 339 U.S. at 314).

Here, the notice program initially approved by the Court on May 9, 2014, was fully implemented.  As set forth above, the claims administrator sent two (2) email notices directly to 338,622 potential class members and published notice in *Better Homes & Gardens*, *Cooking Light*, *People*, *Health*, *Good Housekeeping*, and *American Profile*.  *Declaration of Shannon R. Wheatman, Ph.D.,* at ¶¶ 14 and 21.  Notice was also twice disseminated by the American Diabetes Association's newsletter distributed to over 234,000 recipients.  *Id*. at ¶ 30.  In addition to print advertisements and website postings, notice was posted on the dedicated settlement website established by the claims administration.  *Hyduk Decl*., at ¶¶ 10-11.  Such website contains the settlement agreement, information relating to filing a claim, opting out of the settlement, objecting to the settlement, deadlines relating to the settlement, frequently asked questions, and other relevant information.  *Id*.  As of September 9, 2014, this website had been visited approximately 213,311 times.  *Id*. at ¶ 12. This notice program has fully informed members of their rights and benefits under the settlement, and all required information has been fully and clearly presented to class members.  Accordingly, this widespread and comprehensive campaign provides sufficient notice under the circumstances, satisfying both due process and Rule 23 and the settlement is therefore approved by this Court.

### iii.    Attorneys' Fees

Plaintiffs have also moved for: (1) an award of attorneys' fees in the amount of $2,900,000[2], plus any interest accrued, which is inclusive of litigation costs and expenses in the

---

[2] This amount was negotiated during the parties' mediation and is to be paid directly by the Defendant.  The award will be paid separate and apart from the settlement funds and therefore will not reduce the amount awarded to class members.

amount of $43,046.70; and (2) an incentive award in the total amount of $20,000 to the named Plaintiffs and Ms. Weiss from the Minnesota action for their time expended and oversight provided in connection with this litigation.  In ruling on a motion for approval of attorneys' fees, a District Court must act as a fiduciary for the class.  *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307 (3d Cir. 2005), *as amended* (Feb. 25, 2005).  However, where the "money paid to attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no potential conflict of interest between attorneys and class members." *Rossi v. Proctor & Gamble Co.*, 2013 WL 5523098 (D.N.J. Oct. 3, 2013), *appeal dismissed* (Mar. 21, 2014).  Although the settlement here is not strictly a common fund because the fees were separately negotiated and will be paid apart from money awarded to the class, courts apply many of the same principles as are applied when analyzing a common fund. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 821 (3d Cir. 1995) ("Courts have relied on 'common fund' principles and the inherent management powers of the court to award fees to lead counsel in cases that do not actually generate a common fund.").  As such, the Court will analyze common fund factors to determine the reasonableness of the fees requested herein.

"Courts may award attorneys' fees in common fund cases under either the 'lodestar' method or the 'percentage of the fund' method." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) (citation omitted).  "The lodestar method multiplies hours reasonably expended against a reasonable hourly rate." *Id.* (internal citation omitted).  The Third Circuit has noted, however, that the "percentage-of-recovery method is generally favored in common fund cases because it allows courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure." *Rite Aid*, 396 F.3d at 300 (citation omitted).  In any event, regardless

of which method the Court chooses, the Third Circuit has "suggested it is sensible for a court to use a second method of fee approval to cross-check its initial fee calculation." *Id.*

Here, pursuant to the percentage-of-recovery method, the requested attorneys' fees are reasonable. As an initial matter, the requested attorneys' fees are separate and apart from the settlement award, but even if they were added together to form the common fund, Plaintiffs' requested fee award would be approximately 36.8% of the mere cash value of the fund. Attorneys' fees in the 30% range are not uncommonly awarded in the Third Circuit, and courts in this Circuit have awarded fees of more than 30%. See, *e.g.*, *Rowe v. E.I. Dupont de Nemours & Co*., 2011 WL 3837106, at \*22 (D.N.J. Aug. 26, 2011) (finding award of 33.33% to be reasonable in case establishing \$8.3 million settlement fund); *Milliron v. T-Mobile USA, Inc.*, 2009 WL 3345762, at \*8 (D.N.J. Sept. 10, 2009), *as amended* (Sept. 14, 2009), *aff'd*, 423 F. App'x 131 (3d Cir. 2011) (awarding 33.33% of \$13.5 million). Further, the Court cannot simply overlook the injunctive relief also being afforded Plaintiffs when determining whether the percentage is reasonable. Indeed, Plaintiffs' expert, Dr. Thomas J. Maronick, calculated the value of the injunctive relief to be \$15,494,775, which was determined by the actual difference between the price premium paid by consumers for Dreamfields pasta, and the price consumers are willing to pay for non-premium pasta. See *Declaration of Dr. Thomas J. Maronick*. When adding the value of the injunctive relief, the settlement value results in a total of \$23,394,775 and Plaintiffs' requested attorneys' fee, including litigation expenses, of \$2,900,000 is less than 12% of the total settlement value, which is below amounts routinely approved in class action settlements.

Moreover, the requested fees as against the settlement value meet the *Gunter* factors. Typically, Courts analyze *Gunter* factors when the attorneys' fee comes from the same source as the settlement, *Milliron*, 2009 WL 3345762, at \*9 (In common fund cases of the type presented

here-where attorneys' fees and the Class recovery come from the same source and the fees are

based on a percentage of the Class settlement-the Third Circuit has set forth a multi-factor analysis

[in *Gunter v. Ridgewood Energy Corp*., 223 F.3d 190 (3d Cir. 2000)] to help analyze whether or

not the percentage award is reasonable"); however, as noted above, that is not the case here.   In

any event, the Court is to analyze the reasonableness of the attorneys' fees requested herein in the

same fashion as a common fund.  As such, the Court must consider factors including:

> (1) the size of the fund created and the number of persons benefited;
> (2) the presence or absence of substantial objections by members of
> the class to the settlement terms and/or fees requested by counsel;
> (3) the skill and efficiency of the attorneys involved; (4) the
> complexity and duration of the litigation; (5) the risk of
> nonpayment; (6) the amount of time devoted to the case by plaintiffs'
> counsel; and (7) the awards in similar cases.

*Id*. (quoting *Gunter*, 223 F.3d at 195 n.1).  However, these factors "need not be applied in a

formulaic way … and in certain cases, one factor may outweigh the rest." *Rite Aid*, 396 F.3d at

301.

The first *Gunter* factor for determining a fee's reasonableness is the "size of the fund

created and the number of persons benefitted."  *Gunter*, 223 F.3d at 195 n.1.  As previously

mentioned, the settlement generated a $5,000,000 cash fund to be shared by the class, and a

significant number of persons are going to benefit from this.  Further, an even broader spectrum

of persons, whether class members or not, will benefit from the injunctive provisions of the

settlement.  These facts support approval of the requested fee.  Similarly, the second *Gunter* factor

– the presence or absence of substantial objections by class members to the settlement or attorneys'

fee request – also supports the requested fee award in this case.  As of the date of Plaintiffs' motion

for fees, only twelve (12) objections to the settlement had been received and as this Court

mentioned previously, most of which were identical in nature.  Compared to the vast number of

claims submitted, the slight number of objections weighs heavily in favor of the requested fees. Third, the Court must analyze the skill and efficiency of the attorneys involved. As discussed in the *Girsh* analysis, counsels' experience allowed them to identify the complex issues involved in the case to formulate an efficient strategy in obtaining the proposed settlement, and the Court has no reason to doubt the skill and efficiency of the attorneys involved. The fourth *Gunter* factor involves the "complexity, expense and likely duration of the litigation." *Id*. Again, as stated several times throughout this Opinion, were this litigation to go forward, Plaintiffs would face hurdles with regard to class certification, would need significant expert analysis, and would likely result in an extremely lengthy litigation. As such, in considering the magnitude and complexity of this case, the fourth factor weighs in favor of awarding the requested fee.

The Third Circuit has identified the "risks of non-payment or non-recovery" as the fifth factor to be considered in determining a reasonable award of attorneys' fees. *Id*. These risks include the "risks of establishing liability." *Rite Aid*, 396 F.3d at 304. As set forth above, liability in this case is not certain and accordingly, Plaintiffs' counsel would be at a risk of non-recovery. In the meantime, Plaintiffs' counsel has assumed the risk associated with pursuing this case, advocated for Plaintiffs and the class members, and obtained a substantial settlement. As such, this factor supports the fairness and reasonableness of the requested fee. Next, the amount of time devoted to the case by Plaintiffs' counsel is the sixth factor a court considers in determining the reasonableness of a fee request. *Gunter*, 223 F.3d at 195 n.1. As mentioned previously, Plaintiffs' counsel spent months investigating the factual and legal basis for the claims asserted in the Complaint, reviewed Defendant's public filings, detailed patent application, advertising and websites, as well as numerous blog posts, articles and scientific studies regarding Dreamfields pasta and human glycemic responses to ingestion of certain foods. Plaintiffs' counsel also

interviewed several bloggers, authors, and scientists regarding the claims alleged in the Complaint and spoke to several experts regarding economic, scientific and consumer behavior issues relevant to the case.  They also reviewed and analyzed documents, prepared for and participated in the mediation, conducted discovery, and interviewed key personnel at Dreamfields pasta.  All of this work resulted in a total of 2,016.70 hours of attorney and other professional support time prosecuting this case.  The time spent was seemingly necessary to produce the settlement achieved and justifies the requested fee.  The final *Gunter* factor requires the Court to compare the award to awards in similar cases.  As the Court has already indicated, a fee of 30% or more is not uncommon in class action cases.  The requested fee is comparable to fees typically awarded in analogous cases and is fair and reasonable in relation to the settlement amount, particularly when the value of the injunctive relief is taken into consideration.  Accordingly, all of the *Gunter* factors weigh in favor of the reasonableness of the requested fee.

Moreover, the requested fees suffice under the lodestar cross-check.  "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting" and "district courts may rely on summaries submitted by attorneys and need not review actual billing records." *Rite Aid*, 396 F.3d at 300.  In cases of this nature, fees representing multiples above the lodestar are sometimes awarded to reflect the contingency fee risk, the quality of the result achieved, the complexity of the issues, the skill of the attorneys and other relevant factors. *Id*. at 305-06.  Indeed, the "multiplier need not fall within any pre-defined range," *Id*. at 307, and in complex contingent litigation, multipliers over 2 may be awarded.

Here, counsel have collectively spent a total of 2,016.70 hours of attorney and other professional support time prosecuting this case through September 9, 2014.  The rates billed by counsel range from $350.00 to $850.00 per hour.  See *Declaration of William B. Federman*, at ¶

4; *Declaration of John Zaremba*, at ¶ 4; *Declaration of Brian D. Penny*, at ¶ 4; *Declaration of Charles W. Branham*, at ¶ 5.  Counsels' total lodestar, derived by multiplying counsels' combined total hours by each firm's current hourly rates is $1,180,156.25, such that the requested fee of $2,900,000, inclusive of litigation expenses, represents approximately 2.45 times the lodestar amount.  Given that the "Third Circuit has noted that '[m]ultiples ranging from one to four are frequently awarded in common fund cases where the lodestar method is applied' [and] [i]n fact ... the Third Circuit approved a lodestar multiplier of 2.99 in a case it described as 'relatively simple in terms of proof' in which 'discovery was virtually nonexistent[,]'" *Milliron*, 2009 WL 3345762, at *14 (quoting *In re Prudential*, 148 F.3d at 341; and *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 735 (3d Cir. 2001)), a 2.45 multiplier here is well within the range of reasonableness.

Last, Plaintiffs' requested fee amount includes $43,046.70 in litigation expenses, and Plaintiffs also seek an additional $20,000 incentive award for the named Plaintiffs and Ms. Weiss. According to Plaintiffs, the requested expenses relate principally to retention of highly regarded and experienced experts and mediation services.  "Counsel in common fund cases [are] entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the case." *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 343 (D.N.J. 2002) (citations omitted).  The declarations submitted on behalf of Plaintiffs' counsel detail the expenses and in light of the amount of work that has gone into the matter thus far, this Court has no reason to doubt that these expenses were reasonably and appropriately incurred.  See *In re Visa Check/Mastermoney Antitrust Litig.*, 297 F. Supp. 2d 503, 525 (E.D.N.Y. 2003) *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) (noting that it is common practice to grant expense requests where the "lion's share of

these expenses reflects the costs of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses.").

Moreover, as for the requested incentive award, courts "award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place." *Hicks v. Stanley*, 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005).  The individual Plaintiffs herein as well as Ms. Weiss from the Minnesota action have been actively involved in this matter and fully committed to pursuing their claims.  In participating in this action, these Plaintiffs have helped investigate the claims, reviewed and approved pleadings, maintained regular telephonic and email communications with counsel regarding strategy and developments in the case, reviewed and commented on submissions to the Court and mediator, reviewed and approved the retention of experts, and participated in mediation and settlement discussions on behalf of the class.  See generally, *Declaration of Jesse Weiss*; *Declaration of Joseph Mirakay*; *Declaration of Louis Messina*; *Declaration of Michael Elefterakis*; *Declaration of John Gembinski*.  These are precisely the types of activities that courts have found proper to support reimbursement and accordingly, the Court grants this request.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' final motion for settlement approval [docket #65] is GRANTED; Plaintiffs' motion for attorneys' fees and reimbursement of litigation expenses [docket #66] is GRANTED; and the Objectors motion for leave to file a sur-reply brief [docket #76] IS DENIED, as it is now moot. An appropriate Order accompanies this Opinion.

Date:  October 20, 2014                                              /s/ Joel A. Pisano
                                                                                  JOEL A. PISANO
                                                                                  United States District Judge